Dana M. Cole, Esq. (SBN 89105)
COLE & LOETERMAN
1925 Century Park East, Suite 2000
Los Angeles, CA   90067
Tel: (310) 556-8300 / Fax: (310) 772-0807
email:  dana@danacolelaw.com

Attorney for Defendant,
STEVEN R. GOLDSTEIN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>STEVEN ROBERT GOLDSTEIN,<br><br>Defendant. | No.  CR 20-00597-SB<br><br>DEFEDANT STEVEN GOLDSTEIN SENTENCING MEMORANDUM AND PSR OBJECTIONS<br><br>DATE:  June 8, 2021<br>TIME:   8:00 a.m. |

## DEFENDANT STEVEN R. GOLDSTEIN SENTENCING MEMO

Defendant Steven R. Goldstein submits the following:

### I.

### INTRODUCTION

At the earliest possible stage and after full cooperation, the defendant accepted

responsibility and pled guilty to Count I, 18 U.S.C. 1040 (a)(1), Covid-19 related false statements

on a PPP loan application to obtain benefits in the sum of $655,000.  *Unlike* virtually all other

PPP false statement cases, this defendant used his loan proceeds exactly for what the Cares Act

intended – to pay mortgages and keep laborers working to avoid his residential remodels from

1

going into default.  There were no personal luxury items purchased with the unlawfully obtained funds.[1]  Most importantly, to demonstrate true remorse, contrition, and acceptance of responsibility – *unlike* virtually all other similarly situated defendants – Mr. Goldstein has already paid back a substantial portion of the borrowed funds to the Government (by depositing same with the Court clerk per instruction from the assigned AUSA).  This combination of factors – formal cooperation (see 5K1.1 motion), legitimate intended purpose for the loan proceeds, conservation of prosecution and judicial resources by indictment waiver and payment of substantial restitution all constitute compelling reasons to grant a variance to avoid incarceration, particularly when compared with other PPP-related sentencings.  As will be shown, Goldstein has done everything humanly possible to mitigate consequences of the offense.

II.

**STATEMENT OF FACTS**

Steven Goldstein, age 36, has been self-employed purchasing, renovating, and 'flipping' houses since 2014, primarily through his company Beagle Real Estate Investments, LLC. Additionally, he formed Antelope Valley Residential Development, LLC, with a partner, Ray Magana (who was separately indicted, case no. 21-CR-00007-SB), in 2018 to do the same thing; purchase, renovate and flip houses in an expedited manner.[2]  Both entities primarily obtained its financing from banks, friends, and relatives.  Once the pandemic hit, housing sales ceased for a

---

[1] Most such cases involve alleged fraudsters who used the money to buy Lamborghini sports cars, go to strip clubs, take gambling trips to Las Vegas, invest money in a cryptocurrency account, make risky stock market bets, purchase a 40-foot yacht and a $1 million rowhouse in Washington, DC, and other expenses not allowed by law, according to the Justice Department.

[2] It is important to note that Goldstein was not involved in Magana's other business entity, Forward Builders, even though the agents wrongly concluded that Goldstein and Magana were partners in it – just like Magana was not involved in Goldstein's Beagle Real Est. Inv. entity, which predated Goldstein ever meeting Magana.  Even though Magana had his illegitimate PPP funds deposited into a joint account he held with Goldstein, Goldstein was not involved in that loan application and Magana immediately removed the entirety of funds once deposited for his own use.

2

three-to-four-month period, causing financial panic to Goldstein, who had on-going loan payments, construction costs, and labor expenses.  At that time, four houses immediately fell out of escrow.  Both Beagle and Antelope Valley entities regularly used contractors, who used numerous construction laborers, but those individuals were not true employees as most were construction workers, although supporting families, nonetheless.

The intent of The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses through a program referred to as the Paycheck Protection Program ("PPP").  PPP loans were obtained by applying to a financial institution along with supporting documentation as to the business' payroll expenses. PPP loan proceeds must be used by the business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.

As a result, Goldstein on behalf of Beagle and both Goldstein and Magana on behalf of Antelope Valley applied for PPP funds in May 2020 by uploading falsified payroll records, rent and other business expenses to Bank of America's PPP platform, claiming that their full-time laborers were actual employees.  As a result, Beagle received $355,000[3] and Antelope Valley received $300,000 in PPP funds; total actual loss $655,000, with which the PSR concurs.  (PSR ¶ 8).  Upon receipt of this financial lifeline during the pandemic, Goldstein used all the funds to pay

---

[3] It is also important to note that at the time of the investigation and his arrest, agents believed that Beagle applied for $930,000 in PPP loans.  **This is false.**  Technically unsavvy, Goldstein attempted to upload the same documents three times while applying for his $355,000 loan.  The agents misinterpreted this as an attempt to obtain far more money than he intended and received. The plea agreement also mistakenly references a loss of $725,000, instead of $655,000, consisting of $355,000 for Beagle and $300,000 for Antelope Valley.  (¶ 8, p. 9:13).

laborers, business expenses and loan payments – the exact expenses that the Cares Act allowed. None of the money was used by Goldstein for personal items, luxury items and/or freewheeling spending, although a small fraction, approximately $25,000 was used to pay personal credit card expenses. The vast majority of the credit card payments were for work related expenses, such as construction materials and cash advances for mortgage payments on Beagle's properties. The money was used for its intended purpose, e.g., to directly support laborers (and their families) and to keep loans from defaulting. All vendors, contractors, laborers, and lenders were fully repaid with the PPP funds. Specifically, Goldstein paid the following:

> $500,000 for contractors and laborers;
>
> $ 25,000 (credit card purchases) for construction materials; and
>
> $130,000 for mortgage payments.

Arguably, Goldstein would have been legitimately entitled to a large portion of the PPP funds to cover the aforementioned loan payments, office expense and his personal income losses, just not the employee costs. (*United States v. Harms*, 442 F.3d 367, 379 (5th Cir. 2006), calculating the amount of loss based on the excess benefits received as a result of fraud). Regardless, despite being over-extended, Goldstein knew what he did was wrong by acting illegally out of desperation.

To demonstrate contrition, upon his first contact with federal agents, the defendant fully confessed, provided all requested paperwork, and fully debriefed. Subsequently, upon the Government's request, the defendant provided more detailed cooperation by submitting to a follow up interview with agents and providing detailed information to bolster the case against Magana.

As referenced above, Goldstein will have already paid $355,000 in restitution to the Court by time of sentencing for the full amount of funds received by Beagle, even though, technically,

the Cares Act allows for two-year repayment if the loan is not entirely forgiven.

Notable personal information:  Goldstein was raised by a single mother when his father suddenly died when Goldstein was 13 years old.  Goldstein now supports his mother.  Goldstein is married to a LAUSD public school history teacher.  Goldstein's grandmother was raped and beaten at age 82.  She died thereafter from the inflicted trauma.  The perpetrator was never apprehended.

The defendant has submitted several character letters, briefly summarized as follows:

- Mike Lane, MFT, the defendant's therapist, who states: "Steve describes feeling genuinely trapped between professional and financial ruin and doing something that was clearly improper.  The PPP assistance would likely protect his family and the career that he loved, while satisfying Steve's financial obligation to those he employed . . . . This entire experience has been nothing short of earth-shattering for Steve and his wife Gaby along with their extended families.  The emotional toll however self-inflicted has been severe and the repercussions will likely be felt for years to come";

- Dorothy Goldstein, the defendant's mother, who indicates the devastation that Steve experienced in losing his father right after his bar mitzvah and the overwhelming remorse Steve feels for his current legal troubles.  She also explains how attentive Steve has been and continues to be for her weekly needs, including all shopping during the pandemic so that she would not risk virus exposure;

- Pamela Goldstein, the defendant's sister-in-law, who comments on how caring a person he is.  She states, "Although the funds were dishonestly obtained, Steve used the money for business expenses to make sure his laborers and mortgage lenders were paid. He regrets his poor decision and has expressed that a better route would have to declare bankruptcy";

- Andy Cole (no relation to defendant's counsel), who mentored Goldstein after his father died.  He states: "I believe Steven is a capable and honorable person who, when faced with unexpected financial burdens caused by the growth of his business, made a bad decision to take advantage of the PPP government assistance program";

- Jason Branch, a friend since college, who states: "Steve pled guilty to fraudulently obtaining funds from the Payroll Protection Program, in order to keep his business afloat and meet his business obligations to creditors, employees, and vendors. This is not the Steve I know, and this lone illegal act is not representative of who he is as a person. The Steve I know has always been a model citizen: Respectful of others, generous, financially responsible, respectful of the law, and patient and dedicated in

slowly building his real estate rehabilitation business from scratch despite formal education in the field";

- Gabriela Goldstein, the defendant's spouse, who states: "It has taken many therapy sessions and a lot of thinking on my part to forgive my husband because I am very clear on what my values are, but I am able to forgive him because of who he is. At the end of the day, he is a good man that made a mistake. A lifetime sentence of a felony conviction for paying workers and saving investors funds is an extremely high price to pay and will forever hurt a good man that made a mistake";

- Jordan Davies, a friend in the real estate business, who states: "Over the course of the last 3 – 4 month's Steve has been living in a state of regret and sadness about what transpired, a valuable life lesson was learned and a mistake like this will never happen again. He truly regrets his decision at the time and if he could go back and change what happened he would, even if this resulted in the end of his business. I know my friend and he is a good person, COVID was a year like no other and the societal pressures and outcome will take years to heal"; and

- David Goldstein, the defendant's brother and a government auditor, states: "Steven was born into a difficult circumstance as his parents had a deeply challenged and abusive relationship. Steven was also born with a learning disability which impacted his ability to succeed academically. Steven repeated the 1st grade and continued to struggle throughout school. Steven's Dad died suddenly when Steven was just 13 years old. Steven was largely raised by his Mother, who has had extensive relationship issues, and set a tone for the household lacking wisdom and common sense. When Steven was 12 years old his Grandma, who he was very close to, was brutally attacked and raped. This affected Steven tremendously." In explaining the circumstances of the offense, the defendant's brother states, "When the pandemic arrived, Steven was leveraged financially and not prepared for an economic slowdown in the real estate market. He decided rashly to falsify payroll protection loan applications rather than lose properties and fail financially."

III.

## PSR OBJECTIONS

The defendant disagrees with the PSR calculation to the extent that it references the sum of $1.23MM as "intended loss." (PSR ¶ 40). The USSG defines intended loss as "pecuniary harm that the defendant purposely sought to inflict." (USSG §2B1.1, comment. (n.3(A)(ii)). A recent amendment enables courts to consider a defendant's subjective intent as a relevant factor. (USSG App. C, amend. 792). The defendant never intended this loss because he had nothing to do with Magana's other entities to which this sum applies. As such, if the defendant never "intended" such pecuniary harm, an "intended loss" cannot be attributed to him. (USSG §2B1.1,

6

comment. (n.3(A)(ii)). "When calculating intended loss, the appropriate inquiry is what the loss would have been if the defendant had not been caught." (*United States v. Frisch*, 704 F.3d 541, 544 (8th Cir. 2013)). In the present case, Bank of American funded the sum of $655,000 for both entities. The remaining sums were the result of multiple attempts by Goldstein to upload documents for one loan and/or loans for which Magana applied that had nothing to do with the defendant and the defendant had no shared interest in Magana's other entity.

The Probation Officer's recommendation letter does not address how the money was spent, e.g., to pay construction workers and for business related expenses instead of personal and/or luxury items. When compared to other PPP loan fraud cases, this is a critical distinction worthy of a sentencing variance.

Accordingly, a fairer Guideline calculation should include an additional departure per Government's 5K1.1 motion for cooperation and variance consideration based on reasonably legitimate use of the funds and early substantial restitution payment.

IV.

**COMPARISON WITH OTHER PPP MISSTATEMENT OR FRAUD CASES**

While there have been numerous arrest and indictments for PPP loan fraud, few have been sentenced. It is instructive to note the salient facts and sentences that other District Court judges have imposed in cases involving much more financial loss than in the present case:

- *USA v. Jaafar*, E.D. Virginia, 18 fraudulent PPP applications, $1.4MM proceeds used for personal expenses; sentenced to 12 months;

- *USA v. Hayford*, N.D. Oklahoma, fraudulent PPP application, $8MM proceeds used for personal expenses; sentenced to 24 months; and

- *USA v. Jackson*, S.D. Ohio, fraudulent PPP application, $2.5MM proceeds used for personal expenses; sentenced to 24 months. In a press release, the AUSA stated: "Jackson defrauded programs that were meant to keep workers on the job at businesses suffering because of the pandemic."

7

V.

**LEGAL DISCUSSION**

As a result of *U.S. vs. Booker* 543 U.S. 220, 245, the Sentencing Guidelines are now advisory instead of mandatory.  Accordingly, the district courts should "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing, including "to reflect the seriousness of the offense."

Title 18, United States Code, Section 3553(a), describes the factors that a court should consider in imposing sentence. A district court may impose a variance if the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless. (*Rita v. United States*, 551 U.S. 338, 351 (2007)).

The statute further provides that, in determining the appropriate sentence, the court should consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the sentencing range established" by the Guidelines, "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Ibid.*  In sum, while the statute still requires a court to consider the Guidelines, see *Gall v. United States* (2007) 552 U.S. 38, 128 S.Ct. 586, at 594), *Booker* "permits the court to tailor the sentence in light of other statutory concerns as well," 543 U.S., at 245-246, 125 S.Ct. 738.  (*Kimbrough v. U.S.* (2007) 552 U.S. 85, 108-109).

Accordingly, district courts must treat the Guidelines as the "starting point and the initial benchmark," (*Gall, supra*), and then apply appropriate departures (5K1.1 considerations) and variances.  As defined in *Irizarry vs. U.S.* (2008) 553 U.S. 708, 714, a "[d]eparture is a term of art

8

under the Guidelines and refers only to non-Guidelines sentences imposed under the framework

set out in the Guidelines"; while in contrast, a "variance" refers to a non-Guidelines sentence

outside the Guidelines framework.  (*Id.*)

The Guidelines permit a court to depart from the Guideline range in atypical cases. "The

Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a

set of typical cases embodying the conduct that each guideline describes. When a court finds an

atypical case, one to which a particular guideline linguistically applies but where conduct

significantly differs from the norm, the court may consider whether a departure is warranted."

U.S.S.G. Manual, Introductory Comments, 4(b).

This is precisely one of those cases that falls outside the heartland, thereby warranting a

variance.  A guideline sentence in this case would not adequately reflect the seriousness of the

defendant's conduct with respect to the underlying criminal conduct because Goldstein used the

money unlawfully obtained for a true, legitimate purpose – keeping people working and paying

recurring, reasonable business-related expenses.  Additionally, Goldstein has already repaid most

funds received by his entity, Beagle Real Estate Inv., although funds received jointly with

Magana, who awaits sentencing, have not been repaid.  In numerous public advisories, the

Government has repeatedly commented that it is exceedingly rare for the defendant to use

unlawfully obtained PPP funds for anything other than personal and/or luxury items.  It is even

rarer for the defendant to make substantial restitution prior to sentencing, which can constitute a

variance or downward departure.  (*United States v. Brown,* 985 F.2d 478, 482–83 (9th Cir.1993);

*United States v. Lieberman,* 971 F.2d 989, 996 (3rd Cir.1992); *United States v. Garlich,* 951 F.2d

161, 163 (8th Cir.1991)).[4]  Perhaps, it is also worth noting that pursuant to FIRREA civil penalty

---

[4] Conversely, many courts have held that a payment of restitution prior to sentencing should not constitute a departure or variance so as not to favor the wealthy over the poor.  Goldstein is neither wealthy nor poor but simply trying to '*do the right thing*' by an early substantial repayment of the PPP loan funds obtained.

9

provision, 12 U.S.C. Section 1833a, DOJ is permitted to civilly prosecute bank and loan fraud cases with a lower burden of proof and no resulting criminal conviction.

VI.

### SEC. 3553(a) SENTENCING FACTORS

The primary directive in Section 3553(a) is for sentencing courts to "impose a sentence sufficient, **but not greater than necessary**," which include:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and
to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, sec. 3553(a) further directs sentencing courts to consider the following factors:

1) the nature and circumstances of the offense and the history and characteristics of the defendant;

2) the kinds of sentences available;

3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

4) the need to provide restitution to any victims of the offense.

In the present case, the cautionary language in 2B1.1, applies here – that "there may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted."

"<u>Atypical</u>" for the following reasons: The wrongfully obtained PPP funds were in fact

10

used for a legitimate purpose as referenced above.  The money was spent to support workers, their families, and pay legitimate business expenses, such as construction costs and mortgage payments – exactly what the CARES Act was designed to do.  This is one of degree not adequately taken into consideration by the Sentencing Guidelines and a downward departure or variance can be made to avoid the overstatement of the seriousness of the offense and when the Court considers "an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm."  (§1A1.4).

It is hoped that the Court might exercise its discretion to depart downward to considerable extent when rendering a sentence which is "sufficient, but not greater than necessary" to achieve the purposes set forth in 18 U.S.C. § 3553(a)(2).  (See attached Character Letters describing defendant as a good-hearted, decent person whose serious judgment error would never be repeated).

Given the highly unusual factual scenario recited above, the instant case does not fit the "heartland" of cases related to loan application misstatements, especially because the total funds were used for legitimate purposes with no funds expended for personal use and/or to acquire luxury items.  In addition, substantial restitution has already been paid.

VII.

**RECOMMENDED SENTENCE**

The Probation Officer has recommended 24 months and the Government has recommended 21 months with an additional two levels for cooperation landing in the 15-month range.  The defendant respectfully asks the Court to consider a sentence of six months home confinement with 250 hours of community service.  This suggested sentence is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2) and is substantively reasonable given the totality of the circumstances. (See *Gall v. United States*, 552

11

U.S. 38 (2007)).  Based on immediate acceptance of responsibility, the defendant's Government cooperation, the defendant's business-related use of the funds received, lack of criminal history and substantial payment of restitution.

VIII.

**CONCLUSION**

The defendant has demonstrated the earlies possible acceptance of responsibility by pleading to Count I as it relates to false statement on a PPP loan application and by fully cooperating with the Government, which likely resulted in a plea by Raymond Magana.  The defendant presents as an otherwise responsible and caring person, who has disappointed family, friends and most importantly, himself by committing serious errors in judgment.  As a result, he has done everything possible to mitigate those errors, by using the funds for a legitimate purpose and by pre-sentence payment of significant restitution.  Regardless, he has tarnished his good name that will carry the lifelong sting of a felony conviction.  The impact of that lifetime con-viction alone constitutes significant punishment.  But numerous friends and family paint a very different picture – a financially stressed individual who committed a terrible error in judgment in order to keep his business (and those working for him) afloat.

For the foregoing reasons, defendant respectfully requests a sentence consistent with the comments expressed herein, including the referenced variance, which hopefully qualifies the defendant for home detention in lieu of a custodial sentence.  Of course, additional community service would also seem appropriate.

Dated: May 4, 2021                    Respectfully submitted:

/s/ Dana M. Cole
_____
Dana M. Cole, Esq.
Attorney for Defendant GOLDSTEIN

12

Mike Lane, MFT

948 20ᵗʰ Street, Unit C

Santa Monica, California 90403

310 -429-9727

Mikelanemft@gmail.com

Dear Judge, Blumenfeld,

This letter is to certify that I have been treating Steve Goldstein in out-patient psychotherapy from 11-6-2020 to present for issues arising out of his pending criminal matter. Mr. Goldstein has clearly demonstrated symptoms consistent with a DSM V diagnosis of major Depressive Disorder and is currently taking anti-depressant medication (Zoloft) to treat those symptoms. Mr Goldstein, reports that he applied for the PPP loans fearing that he would lose his business, which had taken on considerable debt due to pandemic forces. Mr Goldstein reports, the money he received from the government loans was used to pay mortgages and to pay the workers he employed. In retrospect however, and with greater insight, Steve knows that what he did was wrong in every respect. Steve takes full responsibility for his poor choices. Steve describes feeling genuinely trapped between professional and financial ruin and doing something that was clearly inproper. The PPP assistance would likely protect his family and the career that he loved, while satisfying Steve's financial obligation to those he employed.

In the final analysis, Steve reports feeling tremendously ashamed both of his behavior and his poor decision-making. I believe Steve is genuinely remorseful and he has made it clear to me that he intends to do whatever it takes to clean up his mistakes and restore his good standing in the community he loves. He is prepared to make full financial restitution, cooperate fully with law enforcement and continue in therapy to understand the unconscious processes animating his behavior.

This entire experience has been nothing short of earth-shattering for Steve and his wife Gaby along with their extended families. The emotional toll however self-inflicted has been severe and the repercussions will likely be felt for years to come. Nonetheless, Steve is determined to learn and grow from all that has transpired, and he is committed to living his life in Integrity. In his own words "I want to do my life the right way" I believe he will, and I believe he will be better for having had this painful experience.

Thank You ,

Mike Lane MFT

License # mfc33336

March 25, 2021

To Judge Blumenfeld:

I am Steven Goldstein's mother. His father passed away suddenly a few months after his Bar Mitzvah. We became a single-parent family overnight. At that time, his older brother was attending the University of California, Berkeley. It was a difficult time for Steven, but he persevered.

Steven graduated from UCLA and taught high school in Torrance for one year. He taught Special Education students. Due to the long commute, he transferred to Los Angeles Unified School District. He was a day-to-day substitute. He was very well liked for his professionalism, and his positive relationships with the students. For these reasons, he received multiple requests from high schools in the San Fernando Valley and he worked daily. He often stayed after school to assist students who needed extra help. After six years of teaching, he changed careers and started his own businesses in real estate.

His two businesses were doing very well until the Pandemic hit and they began to go downhill. My son made a bad decision, he submitted a fake document in order to obtain a PPP loan. He used all the funding for labor and other business expenses in both of his companies. The decision to apply for a government loan with a fake document came with serious repercussions.

Steven was arrested on October 29, 2020. He called me and came over to tell me about this the following evening. He was very pale, and I saw the anguish in his face. He did not look like my son. He began to speak slowly. I heard the sorrow in his voice. He told me what had occurred as a result of his inappropriate decision, and that he felt very guilty. I was speechless. This was not the son I knew. He told me how disappointed he was with himself and that it would have been a much better choice to declare bankruptcy. I agreed. He was very remorseful, and he took complete responsibility for the horrible decision he made. He told me he will never do anything like this again. He said that his priorities were unacceptable and irresponsible. He held himself fully accountable. In one day, my son had learned a valuable lesson. Five months have passed. My son continues to visit me weekly. Each time that we meet, he says that he is looking forward to bringing value into his life instead of chaos. I am proud of my son for acknowledging his mistake and for working incredibly hard to fix it. Going forward, he has chosen a brighter path for himself.

Steven has been incredibly supportive since I retired from teaching seven years ago. I rely on him tremendously to help me with everyday errands such as shopping and doctor's appointments. I depend on his help, especially when it comes to making decisions. As a single, elderly retiree, I look forward to his weekly visits. It is a special time of the week for me, and even more so since the since the Pandemic began. He is compassionate, and always available when I need him, including three surgeries.

Steven is also a devoted uncle to his niece (11), and nephew (13). He rolls out the red carpet when they fly to LA to stay with him for a few days from Lake Tahoe. He is generous with his time, his resources, and his love. They adore him. He takes them to LA attractions like Disneyland, Universal Studios, the beach, and of course, a Dodger game.

This was his first arrest, and it was not a violent crime. I pray daily that house arrest will be considered for his sentencing so that he will be able to earn a living. This will allow him the opportunity to repay the financial balance that he owes to the government. He is bringing $300,000 towards his restitution. He will also be able to continue helping me. I need him.

Thank you for considering house arrest for my son, Steven Goldstein.

Sincerely,

Dorothy Goldstein

March 26, 2021

Dear Judge Blumenfeld,

I have known Steven Goldstein for 30 years since he was 6 years old.  I am his sister-in-law.

Steve is a good person, who made a terrible mistake. I believe his poor judgment was out of character because of the additional financial stress he was under due to the pandemic.

Steve came to visit us after he was arrested and charged with PPP loan fraud. It was apparent to me that Steve was taking full responsibility for his mistake and working extremely hard to come up with the restitution payment. I believe he learned his lesson, and this will be his first and last time breaking the law. He has expressed to me his remorse and desire to learn from this experience so it will never happen again. His genuine sincerity is why my husband and I agreed to lend him some money to use for the restitution payment.

I know he will continue to work hard to right this wrong. Steve has been working weekly with a therapist to identify and correct the faulty logic that caused him to be in this situation.

Steve has been an excellent brother-in-law to me and wonderful uncle to my Children. He has also been a great son to his mother. During the pandemic he stepped up and did all the shopping for his mother so she would not be exposed to the virus. He also helps her with errands, fixing stuff and doctor appointments. He provides her with emotional support, and she relies on him greatly.

I hope you will consider leniency when sentencing Steve. Although the funds were dishonestly obtained, Steve used the money for business expenses to make sure his laborers and mortgage lenders were paid. He regrets his poor decision and has expressed that a better route would have to declare bankruptcy. I believe he can create the most value for society in house arrest. This will allow him to continue working so he can pay back all the restitution money he owes to the Government as quickly as possible.

Sincerely,


Pamela Goldstein

March 27, 2021

Andy Cole
20219 Gault St.
Winnetka, CA  91306

Dear Judge Blumenfeld:

My name is Andy Cole and I am writing you concerning a friend of mine, Steven Goldstein.  I am a graduate of CSUN and have been the CFO of a property management company for the last 20 years.  I contribute to the school annually and participate in their professor for a day program.

I have known Steven Goldstein since he was 13 years old; his father was a neighbor and friend and when Rick passed away at a fairly young age,  his mother asked that I spend some time with him as he had no other male role model in his life.  I have seen his growth from a teenager to a responsible adult, one who provides for his family and cares about his elders.  I watched him learn that he was not the quality hockey goalie he hoped to be, and make the decision to pursue a college degree elsewhere.  For several years he struggled as a teacher, a job he did not enjoy but continued with it because, like most of us, work was an essential part of his sense of well being in society.

As a financial professional, it was painful to hear of the trouble Steven got into because of his business obligations.  I wish I had spent more time with him discussing integrity in business. I believe Steven is a capable and honorable person who, when faced with unexpected financial burdens caused by the growth of his business, made a bad decision to take advantage of the PPP government assistance program.

I know Steven regrets his actions and feels significant guilt in knowing that he disappointed his family, friends, and most importantly, himself.  He knows that his fraudulent actions will stay with him for the rest of his life  I do believe Steven is and can be a productive member of society.  His actions concerning the PPP loan were of course wrong and he should have known better, but I also believe that, given a chance, his character will shine through.  I do not believe he will ever do anything like this again. I hope you will consider leniency in his sentencing.


Sincerely,



Andy Cole

Jason Branch
3711 W 230th St #236
Torrance, CA 90505

Honorable Stanley Blumenfeld Jr
United States District Judge
United States District Court for the Central District of California
350 West 1st Street
Los Angeles, CA 90012

Re: Steven Goldstein

February 11, 2021

Dear Judge Blumenfeld,

I write this letter in support of my friend Steve Goldstein. I have known Steve since 2005 when we were both students at UCLA, and became very close friends with him in 2008 after attending a mutual friend's birthday party. We connected on a variety of topics, including hockey, current events, history, capital markets, and physical fitness. We maintain these connections to this day. I was a Groomsman at his wedding in 2010, he was a Groomsman at my wedding in 2017, and is a Godfather to my daughter born in 2019.

Over the past few months, I have come to understand that in wake of the COVID-19 pandemic and its economic impact, Steve pled guilty to fraudulently obtaining funds from the Payroll Protection Program, in order to keep his business afloat and meet his business obligations to creditors, employees, and vendors. This is not the Steve I know, and this lone illegal act is not representative of who he is as a person. The Steve I know has always been a model citizen: Respectful of others, generous, financially responsible, respectful of the law, and patient and dedicated in slowly building his real estate rehabilitation business from scratch despite formal education in the field.

Although Steve has pled guilty to the charge, I am still proud to call Steve a very close friend and the Godfather to my daughter. Our families have seen each other a several times since (while following safe COVID-19 guidelines) and I continue to regularly talk to Steve. I am confident that he has learned from his mistake in using the Payroll Protection Program, and understands that it was not the proper course of action to address the economic desperation of his business due to dramatic unforeseen circumstances. In light of these factors and my support on behalf of Steve, I respectfully request your consideration of leniency in sentencing of my friend.

I can be reached by phone anytime at 310-903-1588, if there are any questions or additional information requested of myself.

Sincerely,

Jason Branch

Gabriela Goldstein
18624 Calahan St.
Northridge, CA. 91324

Dear Judge Blumenfeld,

My name is Gabriela Goldstein, and I have known Steven Goldstein since I was 18 years old and have been married to him for the past 10 years. He has never gotten in trouble in all of those years and has nobly led his life. I am a public-school teacher and have been an educator for the past 7 years. I have received several awards during my career, including; 2020 Outstanding Social Studies Teacher of the Year by the California Council for Social Studies, selected as the Los Angeles county Teacher to attend the Supreme Court Summer Institute for Teachers by Street Law, and received the Humanitarian Award 2017-208 by the Los Angeles Education Board.  Any listing of my accolades is solely to make the point that Steven chose to marry someone who has dedicated their life to public service. In all of those years, he has always been supportive of all my teaching efforts and dedication. The current charges Steven is facing are utterly contradictory to any of his previous actions and are entirely out of character for as long as I have known him. I was always very proud of my husband throughout the years because of all the personal challenges he had overcome and because I found his dedication to a very difficult mother admirable. Out of both him and his older brother, it has been my husband that helps take care of his mother. I honestly think that my husband put himself in an impossible situation. In his attempt to pay workers, save his investors funds, and not foreclose on properties in the middle of an unprecedented pandemic, his one action turned his world upside down.

We met at the end of freshman year of college, and this event has been the most traumatizing experience in both of our lives. Please know that this event has been absolutely detrimental to us, heartbreaking and emotionally draining. We sold our home, Steven sold his car, and we have cut our expenses as much as possible to pay back his debt and because it is the right thing to do. We have always been very responsible; we limited our expenses as student loans were paid off and delayed having children.

After this first happened and after moving forward from complete shock, I began to research the kind of trouble Steven was in. I read everything I could find on the internet, listened to every podcast, and read every blog. Judge Blumenfeld, this is the only case I found of a person that used the funds he accessed to pay other people. He did not use his funds to gamble it away, buy a Lamborghini, or any other frivolous items, unlike other defendants.

I can tell you that this event has completely changed our lives and has been transformational for Steven Goldstein. I know you will never hear his name again in a future case and that he has learned more lessons than I can list in this one letter to you. He could have filed for bankruptcy, and many families and banks would have lost money in the middle of an unprecedented pandemic and tragic year for so many. I think he was poorly influenced because he felt so much pressure that he took the action that put him before your chambers.

It has taken many therapy sessions and a lot of thinking on my part to forgive my husband because I am very clear on what my values are, but I am able to forgive him because of who he is. At the end of the day, he is a good man that made a mistake. A lifetime sentence of a felony conviction for paying workers and saving investors funds is an extremely high price to pay and will forever hurt a good man that made a mistake. Thank you for your time and consideration.

March 31, 2021

To the honorable judge Stanley Blumenfeld,

I have known Steven Goldstein since he was a young lad in 1992 when we moved in next door to where he was then living.  Over the years I have seen him grow up dedicated to family, working hard at school, working even harder at learning to drum, finishing college, getting married, and following his passion of real estate improvements.  He has been able to be very focused, and has accomplished a lot as a young man.

Steven is a very caring person and is always willing to help, or even offer help without being asked.  He visits his mother regularly and assists her with a variety of tasks, and often visits my family as well after he leaves his mother who still lives in the same town as we do.  He and his wife have plans to start a family and have children of their own who they can shower with the love and care they are used to.

Steven had mentioned to me about the PPP program and that he was thinking of taking out a loan to help keep the seven to eight projects he was running at the time moving forward during COVID, and to make sure he had enough funds to pay the employees and lenders, which was the goal of the program, and his foremost concern.  After those conversations I had no doubt that Steven would be using those funds for the intended purpose.

Steven came to my house early the next morning scared and distraught after he has been released from jail.  He knew I was worried since I have been trying to get hold of him several times the previous day.  We have had many long conversations since that day, and I can sense and see nothing but remorse and disappointment about what he has done and the people he has let down. He is especially upset about the fact that even though he had the right intentions in taking the loan, he did not go about it the right way.  He has mentioned to me several time that he will never ever take a penny from anyone unless it can be given to him in a completely kosher way.

I think that Steven Goldstein has already paid his price.  He has a completely different mind set about moving forward.  Steven is trying everything he can do to make this right by paying back as much as he can right now, cooperating with the district attorney with whatever useful information he can offer, and most importantly, learning from what has happened to live a completely different life style in the future.

I beg your honor to look at the fact that unlike other criminals who did not have legit companies, took out much much larger sums of money, and did not use the funds for the intended purpose, Steven has done with the money what he said he would from the beginning - keep people working, lenders paid, and move things forward during the very difficult times we have recently been through.  Thank you for your time your honor.

Fred Wohlfarth

January 27, 2021

Honorable Stanley Blumenfeld Jr.

United States District Judge

United States District Court for the Central District of California

350 West 1st Street

Los Angeles, CA 90012

Judge Blumenfeld:

Thank you for the opportunity to share with you some details regarding the life and experiences of my younger brother, Steven R. Goldstein.  I understand that Steven has plead guilty to a felony due to his misuse of a federal loan program designed for payroll protection amid the COVID-19 pandemic.  Despite Steven's lack of judgement regarding this loan, I believe that his life circumstance provides insight to his regretful decision.  Also, Steven has demonstrated strong character and the ability to perform good deeds throughout his life.  Further, I believe Steven recognizes his mistake, is truly remorseful, and has learned and grown from this experience.  Thus, I hope the court will consider leniency for Steven.

Steven was born into a difficult circumstance as his parents had a deeply challenged and abusive relationship.  Steven was also born with a learning disability which impacted his ability to succeed academically.  Steven repeated the 1st grade and continued to struggle throughout school.  Steven's Dad died suddenly when Steven was just 13 years old.  Steven was largely raised by his Mother, who has had extensive relationship issues, and set a tone for the household lacking wisdom and common sense.  When Steven was 12 years old his Grandma, who he was very close to, was brutally attacked and raped.  This affected Steven tremendously.  Three years later that Grandma died.  She had never been the same since her attack.  When Steven was 19 years old his other Grandma died.  During Steven's teenage years he lost his Father and both Grandmothers.  He never met his Grandfathers.

Regarding Steven's good deeds, he is a devoted son to his aging Mother.  Steven has gone grocery shopping weekly for his Mother (73) since the pandemic began, so she can safely shelter in place.  Steven is the primary caregiver for his Mother, arranging her medical care and visiting her daily during two major recent medical operations.  Steven's Mother had total knee replacement surgeries in 2017 and 2019, leaving her in great need of his daily presence, including administrative and emotional support over the course of several months.  Steven has also been a very mature and responsible uncle to my two children, ages 11 and 13.  Steven has hosted them for weekend visits, offering site seeing tours of Los Angeles, including taking them took them to Disneyland several years ago.  Steven has always been a positive influence on my kids.

Steven's regretful decision to misuse a federal loan program has impacted him greatly and changed his outlook on life.  Steven is remorseful and has grown and changed from this experience.  When the pandemic arrived, Steven was leveraged financially and not prepared for an economic slowdown in the real estate market.  He decided rashly to falsify payroll protection loan applications rather than lose properties and fail financially.  Steven went along with his business partner's bad idea and he deeply

regrets that.  Steven knows that he was wrong and that he should have filed for bankruptcy instead.
However, had Steven declared bankruptcy, over $500,000 in labor payments would not have been made
to contractors and many employees would have lost income during an acutely financially challenging
time.  Had Steven received better guidance during his formative years, perhaps he would have exercised
better judgement.  Nevertheless, Steven has learned his lesson and is remorseful.  He is ready to start a
new chapter in his life where he will never make a mistake like this again.  Given all the circumstances
mentioned here, I hope the court will consider leniency for Steven Goldstein.

Sincerely,


David M. Goldstein

P.O Box 10240

Zephyr Cove, Nevada 89448